IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 10-cv-02130-RBJ

UNITED STATES OF AMERICA,

    Plaintiff,

v.

CHARLES BARRETT, and
KATHLEEN BARRETT

    Defendants.

## ORDER

This matter is before the Court on review of the recommendation of United States Magistrate Judge Boyd N. Boland to discharge the writ of ne exeat republica pursuant to which Charles and Kathleen Barrett have been detained in the United States for approximately three and one half months. Jurisdiction is proper under 26 U.S.C. § 7402 and 28 U.S.C. §§ 1340 and 1345. I decline to discharge the writ at this time for the reasons set forth herein.

### STANDARD OF REVIEW

This appeal is based upon the record and briefs submitted by the parties. I consider the recommendation on this unusual writ to be a recommendation on a dispositive motion. Therefore, I review de novo the portions of the magistrate judge's recommendation on which an objection has been properly made. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

# FACTS

### A. The Writ.

In 2008 Mr. and Mrs. Barrett filed a fraudulent tax return for the 2007 tax year that resulted in a $217,615 tax refund to which they were not entitled. The Internal Revenue Service discovered the fraud in February 2009. Although the Barretts filed a return in March 2009 in which they acknowledged that the tax withheld was incorrectly reported, they did not return the wrongfully obtained refund. The government has been trying through various means to find and obtain assets to apply to the debt since that time. This lawsuit and the subject writ are part of that effort.

Specifically, on September 1, 2010 the United States filed this action, alleging that the Barretts had removed certain funds from the United States, and seeking an order and judgment requiring that the funds be repatriated to be applied to their tax debt. [ECF No. 1]. In an effort to identify assets available for application to the debt, and to collect such assets, the United States on November 4, 2010 filed an ex parte sealed motion for the issuance of a writ of ne exeat republica against the Barretts. [ECF No. 13]. A writ of ne exeat republica is a form of injunctive relief ordering the person to whom it is addressed not to leave the jurisdiction of the court or the state, for example, to aid the sovereign to compel a citizen to pay his taxes.[1]

On December 2, 2010 this Court, by Senior District Judge Zita Leeson Weinshienk, granted the motion and ordered (1) that a writ be issued to restrain the Barretts from departing the jurisdiction of the Court until further court order; (2) that they be required to post security for their tax obligation, penalties and interest either in the amount of $351,196.97 or in the amount

---

[1]. *See, e.g.*, *United States v. Shaheen*, 445 F.3d 6, 9–10 (7th Cir. 1971).

2

of the value of their net equity in their worldwide assets; (3) that they be kept in the custody of the United States Marshal pending a final evidentiary hearing; (4) that they produce all books and records of their assets; and (5) that they may not assign, encumber or otherwise alienate any property belonging to them. [ECF No. 19]. An evidentiary hearing was set for December 2, 2011. *Id.* An amended version of the order was issued on December 13, 2010. [ECF No. 26]. The writ was formally issued by Magistrate Judge Boland on the same date. [ECF No. 27].

The Barretts, however, had relocated to Ecuador. They were served there on December 21, 2010 [ECF No. 39]. The writ of ne exeat republica lost any benefit at that time, since they apparently had left the jurisdiction of the United States before it was issued.

### B. Default Judgment.

The Barretts did not respond to the Complaint. On December 7, 2011 a default was entered [ECF No. 43]. On April 9, 2013 a default judgment was entered against the Barretts in the amount of "$255, 976.68 plus interest and other statutory additions, less any payments, and less any payments made against the liabilities, accruing from March 1, 2013." [ECF No. 51]. The Barretts were also ordered to repatriate certain funds that they had wired to the Banco de la Republica Oriental del Uruguay, and the United States was awarded its costs. *Id.* The Barretts did not comply with the order to repatriate the funds wired to the Uruguay bank. They did file three motions to vacate the default judgment [ECF Nos. 53, 60 and 62].[2]

### C. Detention.

In the summer of 2013 the Barretts visited the United States, apparently to attend their daughter's wedding. On August 8, 2013 United States Marshals detained them pursuant to the

---

[2] Numbers 60 and 62 were denied as duplicative of number 53 [ECF. No. 104], and number 53 was ultimately withdrawn by the Barretts through counsel, [ECF No. 127].

writ. Defendants were ordered to turn over their passports and any international travel documents to the Court and to remain within the United States. They have been living with relatives in Colorado since they were detained.

### D. October 11, 2013 Hearing.

An evidentiary hearing was held in front of Magistrate Judge Boland on October 11, 2013 [ECF No. 110] in order to determine whether the writ should remain in effect.[3] At the hearing, the United States provided evidence that one or the other or both of the Barretts own assets abroad, including the following:

- Approximately $12,000–$13,000 in a bank account at ProduBank, located in Cuenca, Ecuador. EH, 41:23–25, 59:25, 60:1–4. The United States provided a copy of the latest bank statement produced, which indicated a balance of $12,792.81. *Id.* at 41:23–25, 42:1–7.

- Approximately $1,623–$1,823 in Pichincha Bank, located in Cuenca, Ecuador. EH, 127:12–17, 130:1–4, 132:21–25, 133:1. The United States submitted three copies of bank statements from this account. *Id.* at 128:12–21, 129:3–17, 129:24–25, 130:1–10. The latest statement is dated August 30, 2013. *Id.* at 134:1–4.

- Approximately $114 in Cooperativa JEP bank, located in Cuenca, Ecuador. EH, 136:11–18.

- Approximately $60 in First State Paonia Bank, located in Paonia, Colorado. EH, 126:18–25, 127:1–2.

---

[3] Citations to this evidentiary hearing will take the following form: EH, Page:Line.

- A 50% interest in real property in Ecuador that was purchased, in total, for $64,000 and subsequently improved.  EH, 28:11–19, 29:19–24, 30:3–24.  The United States submitted a deed for this property.  *Id.* at 32:1–13, 33:22–24.

- A Chevy Trailblazer purchased in November 2010 for $18,000.  EH, 34:3–8, 135:19–21.  The United States submitted the title to the car.  *Id.* at 34:24–25, 35:1–14.

- Two shares of PepsiCo stock owned by Mrs. Barrett.  *See* EH, 37:4–8, 74:7–16.

- Minority interests in various companies across Latin America associated with a United States agricultural products producer and distributor, Ralco Nutrition.  *See* EH, 38:11–25, 39:1–6, 117:20–24, 118:10–14, 119:7–9, 119:25, 120:1.  The evidence indicated that these interests were:

    o  a 1.82% interest in RalcoNutri, EH, 117:20–24, a company that owns equipment, product inventory, registrations, and copyrights, *id.* at 118:5–9.

    o  a 2% interest in Ralco Uruguay, EH, 118:10–14, a company that owns inventory and office equipment, and which has six to ten products already registered, *id.* at 118:23–25, 119:2–5.

    o  a 2% interest in Ralco Costa Rica, EH, 119:7–9, a company that is in the process of registering products, *id.* at 119:18–22.

    o  a 2% interest in Ralco Panama, EH*,* 119:25, 120:1, a company that is in the process of transferring products and registering, *id.* at 120:12–13.

    o  a 40% interest Agro Natural, a company related to Ralco Nutrition.  EH, 38:12, 38:24–25, 29:1–6.

- Minority and majority interests in various other companies across Latin America, including BCS (51%), Aqua Solutions (50%), Jerusalem Fund (10%), and Ecuador

5

> Medical Tourism Association (61–100%). EH, 65–74, 116:20, 116:24–25, 120:16–21, 121:1–2, 122:10–13, 122:20–22.

- A minority interest in U.S. company Petra Petroleum (12%). EH, 123:9–16.
- Office furniture and business equipment in Ecuador valued by Defendant Charles Barrett at approximately $6,984. EH, 142:6–11; *see also id.* at 141:15–19.
- Ecuadorian silver coins no longer used as currency worth approximately $1,000 in melt. EH, 40:2–5, 63:6–13.
- Jewelry with unknown value. EH, 37:18–23, 38:6–10.
- Rental Income of $300–400 per month. EH, 52:5–21, 95:14–22.
- A horse with unknown value. EH, 162:2–5.

During the evidentiary hearing, the Barretts maintained that the assets established by the United States were primarily valueless for a number of reasons, including:

- The $12,000–$13,000 at ProduBank cannot be accessed from the United States. EH, 92:11–14. Mrs. Barrett later testified at a November 21, 2013 show cause hearing[4] [ECF No. 142] that she could not access her bank account via her ATM card. *See* SCH, 21–23. However, Mrs. Barrett has never attempted to access her bank account via a different bank's ATM machine, to call the bank using the phone number on the back of the card, to utilize the online banking features of ProduBank, or to have Western Union assist with a transfer from the bank. *See id.* at 25–27.
- There had been a $700 deduction from the Pichincha bank account after the date of the latest bank statement. EH, 134:9–10. During his testimony, Mr. Barrett claimed that there was a more recent bank statement; however, defense counsel represented

---

[4] References to this hearing will be cited as SCH, Line: Page.

6

that the most recent statement they had matched the one the United States entered into evidence. EH, 133:10–25, 134:1.

- The 50% interest in real property cannot be sold because the property is the subject of a boundary dispute within Ecuadorean courts. Mrs. Barrett testified that it is illegal to sell property in Ecuador without proper boundaries being established; that "[w]e could go back on [the person who sold the property to us] but we haven't chosen to do that"; and that although the Barretts have been trying to clear up the dispute, she does not know whether any progress in resolving the dispute has been made. EH, 29:6–18; 76:6-21. She later added that the fact that she is in the United States and not in Ecuador is another reason that the property cannot be sold. EH, 106:12-15.

- According to Mrs. Barrett, the Chevy Trailblazer has a Blue Book value of only $3,237.60. EH, 79:13–18. Defendants also claim they cannot sell the Chevy Trailblazer from the United States. EH, 79:19–21.

- Mrs. Barrett testified that she cannot sell her shares of PepsiCo because she does not have physical possession of the shares, she does not have documentation for them, and, despite their having been a gift from an aunt and uncle, she does not "know of any way that I would sell them." EH, 74:17–21.

- Mrs. Barrett's 40% interest in Agro Natural, a company related to Ralco Nutrition, has no value according to her. EH, 39:10–12.

- The value for all of Defendants' other interests in Latin American companies is either zero or negligible, according to Mrs. Barrett. *See generally* EH, 65–74. While Mrs. Barrett first claimed that many of these companies were in the process of being shut down, or that operations had halted, *see generally* EH, 65–74, she later stated that the

7

companies "were just established" and "have not had time to became viable," *id.* at 103:20–21. Mr. Barrett stated that two companies, BCS and Ecuador Medical Tourism Association, are in the process of being shut down because "[i]f you do not make profit in two years in Ecuador the minister – the superintendent of companies orders you to close down a company." *Id.* at 121:7–11. This claim was not confirmed by other evidence. Mr. Barrett later testified that he sold part of his interest in BCS for $20,000 at some time within the last four years. *See id.* at 159:7–14; *see also* 157:24–25.

- Petra Petroleum, a U.S. company in which Mr. Barrett owns a 12% interest, is no longer operational and does not own any assets. EH, 123:21–25, 124:1. Mr. Barrett later testified that there is a Petra Petroleum account with Bank First in Oklahoma that he had previously used to pay personal credit card bills. EH, 137:24–25, 138:1–3. According to Mr. Barrett, the account is still open but in the process of being closed because it is worth negative $244. *Id.* at 138:4–5.
- The valuation of the office equipment and furniture--Mr. Barrett's personal valuation--is not relevant according to Mr. Barrett, because "Ecuador wouldn't even allow this in [a separate court case] because without a factura [invoice] it has no value. But I wrote it down trying to claim value. So you can value it at whatever." EH, 142:14–16.
- The location of the Ecuadorian coins is unknown, but Mrs. Barrett "assum[es] they're down there [in Ecuador]." EH, 40:8–13.

8

- The jewelry is "nothing of value," EH, 38:9–10, and its location is currently unknown, *id.* at 37:24–25, 38:1–5. There has been no evidence showing that the jewelry has been appraised.

- All of the rental income the Barretts earn per month is paid, Mrs. Barrett claims, to a caretaker to check on the property. EH, 52:16–19, 96:13–15. Mrs. Barrett also claimed that she and her husband are overpaying rent on the rental units (as they do not own the units) but that they will not be pursuing a refund for the overpayment. EH, 52:8–14, 53:1–13, 90:21–24.

- Defendants do not know if the horse has been sold. EH, 162:6–7.

The combined value of these assets appears to add up to more than $48,000. Mrs. Barrett testified that if she were to sell everything she owned, "[t]o the best of [her] knowledge" she would be able to sell it for $48,595.97. EH, 88:22–25, 89:4–9.[5]

### E. Recommendation.

At the conclusion of the hearing the magistrate judge indicated that he would recommend that the writ of ne exeat republica be discharged. The magistrate judge found that such a writ may, in appropriate circumstances, be issued to detain a citizen for a limited time to enable the government to obtain discovery as to the location, value, and legal status of the taxpayer's property. EH, at 225. However, to sustain the continuation of the writ, the government must make a showing similar to that necessary to obtain a preliminary injunction. *Id.*

The writ was issued because an affidavit filed by the government had indicated that large sums of money had been transferred to international bank accounts. However, the magistrate

---

[5] Mrs. Barrett qualified that answer by stating that she could not realistically sell everything she owns at this time. EH, 89:10–12. According to Mrs. Barrett, this is due to the fact that she is not in Ecuador, and thus not in a position to sell possessions located in that country. *Id.* at 89:20–21.

judge found that there were significant errors in the affidavit. *Id.* at 226. In any event, the evidence showed that there were "minor assets" outside the country (a car valued at less than $5,000, some bank accounts described by the defendants as valueless and by the government as perhaps slightly more than $10,000), but that those assets did not justify the continued prohibition of international travel. *Id.* at 226–27. As for the one more substantial asset, the real property in Ecuador, the magistrate judge found that the evidence showed that it cannot be liquidated, and therefore, that continuing to restrain the freedom of the defendants to travel (because of that asset) "serves no purpose and amounts to an improper burden on them." *Id.* at 227.

Magistrate Judge Boland followed his bench ruling with a written recommendation that the writ be discharged, issued on the same day. [ECF No. 106]. The court held that in order to obtain a writ of ne exeat republica, or in this instance to continue the writ in effect, the government had the burden to prove (1) a substantial likelihood of success on the merits, (2) irreparable injury, (3) which outweighs the potential harm to the defendants, and (4) that continuation of the writ would not disserve the public interest. *Id.* at 2 (citing *United States v. Mathewson,* No. 92-1054-Civ.Davis, 1993 WL 113434, at *2 (S.D. Fla. Feb. 25, 1993). Magistrate Judge Boland found that the default judgment satisfied the first factor, and the purpose of the writ to aid in the collection of taxes satisfied the fourth factor. Recommendation at 2–3. However, because the government "failed to identify any substantial assets of the Barretts existing outside the United States and capable of liquidation, and the Barretts established that no such assets exist," it had not shown that the Barretts' departure from the United States would substantially prejudice its collection efforts. *Id.* Thus, the government had not

established the second (irreparable injury) or the third (harm to the government outweighs potential harm to the defendants) factors. *Id.* at 3.

The government filed a timely objection to the recommendation [ECF No. 111], to which the Barretts responded [ECF No. 117], and the government replied [ECF No. 119].

### F. Contempt.

Shortly after the hearing on the writ (and before filing its objection to the magistrate judge's recommendation), the government filed a motion to hold the Barretts in contempt of the court's April 9, 2013 order requiring them to repatriate and pay to the United States the funds they had wired to the Banco de la Republica Oriental del Uruguay. [ECF No. 109]. Judge Boland issued an order directing the Barretts to show cause as to why they should not be held in contempt. [ECF No. 113]. Following receipt of the Barretts' response [ECF No. 118] and a hearing on November 21, 2013, the magistrate judge on December 4, 2013 issued a written order certifying certain facts to this Court (per 28 U.S.C. § 636(c)) that demonstrated that the Barretts were in contempt of the repatriation order, and recommended that the Barretts be confined in a half-way house until the contempt is purged. [ECF No. 131].

The facts certified, beyond reciting the Barretts' receipt in 2008 of an undeserved refund exceeding $215,000, included among a list of 16 numbered paragraphs the following key findings:

- In January and February 2009 the Barretts sent $16,000 by wire transfer to the Banco de la Republica Oriental del Uruguay.
- The default judgment included an order that those funds be repatriated and paid to the United States.

11

- Despite their knowledge of that order, the Barretts have failed to and refused to repatriate those funds.

- The Barretts possess assets located outside of the United States that are available to satisfy, in whole or in part, the repatriation order. In particular, Mrs. Barrett admitted that as of March 2013 her account at ProduBank had a balance of $12,792.81. Although she testified that she could not access the account via her bank card, she has made no meaningful attempt to access the funds in the account. In addition, Mr. Barrett owns minority interests in a list of 10 companies.

- The Barretts' failure to repatriate funds equal to the $16,000 sent to the Uruguayan bank from either the ProduBank funds or the sale or transfer of minority interests in the 10 companies are acts of contempt.

*Id.* at 5–9.

### G. **Purging the Contempt.**

On January 6, 2014 the government notified the court that on December 17, 2013 it had received $16,000 in proceeds from its levy on Jon Knochenmus, the majority owner of the Ralco entities in which Mr. Barrett owned a minority interest. [ECF No. 143]. The government advised that its application of those funds to the Barrett's 2007 tax liability appeared to be sufficient to purge the contempt finding. *Id.* Judge Boland agreed. On January 7, 2014 he issued an order withdrawing his certification of facts and recommendation that this Court find the Barretts in contempt. [ECF No. 144]. He simultaneously denied the government's motion to hold them in contempt. *Id.*

## ANALYSIS

The matter is before this Court solely on the magistrate judge's recommendation to discharge the writ of ne exeat republica. With two exceptions I agree entirely with the magistrate judge's findings and conclusions.

First, I agree that the four-factor test, set forth in the *Mathewson* case, 1993 W.L. 113434, at *2, and adopted by Judge Boland, is a reasonable standard to use in the decision whether to issue or to continue the writ. I likewise agree that it is an extraordinary writ. Because the writ restrains the Barretts' constitutional right to travel, the government bears a heavy burden to show exceptional circumstances warranting such relief. *See, e.g.*, *Shaheen*, 445 F.2d at 10; *United States v. Clough*, No. C-73-2105-SW, 1977 WL 1196, at *3 (N.D. Cal. May 20, 1977).

Regarding the first *Mathewson* factor, which focuses on the merits of the government's tax claim, the default judgment establishes the Barretts' tax liability. It is undisputed that they have not fully satisfied that judgment. The evidence presented at the October 11, 2013 hearing established that the United States collected what it could from the Barretts' assets in the United States. EH, 184:2–4. Indeed, Mrs. Barrett admits that the Barretts have no substantial assets remaining in the United States. *Id.* at 51:14–17. The United States has also established that the IRS has few other tools remaining to use to collect against the Barretts' foreign assets. *Id.* at 184:14–25, 185:1–3. Specifically, revenue officer Roseanne Miller testified that "there's very little we can do once the money is moved off shore." *Id.* at 184:23–24.

Likewise, I agree that the fourth *Mathewson* factor, focusing on the public interest, has been satisfied. It is in the interest of the public that the government collect taxes due and owing to the United States.

I also agree with the magistrate judge that the resolution of the writ issue turns on a comparison of the injury to the Barretts if the writ is continued to the injury to the United States

13

if the writ is discharged (the second and third *Mathewson* factors).  In that regard I note, contrary to suggestions occasionally made by or on behalf of the Barretts during the history of this case, that this is not a "debtor's prison" situation.  The Barretts are not in custody.  But I will roughly analogize, to their benefit, their retention in the United States to imprisonment.  However, their detention is not based on their failure to pay their debt.  If they cannot afford to pay it, then they cannot be detained.  Rather, their detention is proper only if the government proves that they have assets outside the United States that they could apply to the debt but which they have unreasonably refused to apply.

Finally, I agree that much of what the government established in the way of the Barretts' assets held outside the country amounts essentially to dribs and drabs that do not justify continuing to detain them.  I include in that group evidence of relatively nominal bank accounts in the Pichincha and Cooperative JEP banks (which may or may not exist today); the actual cash value that might be realized in a forced sale in Ecuador of the Chevy Trailblazer and used office furniture; the Ecuadorian coins; Mrs. Barrett's jewelry; rental income; and the horse. I am not suggesting that this assortment of "small stuff" has no value, or that the Barretts could not realize some value from these items if they wanted to.  However, the government did not prove that these items had sufficient value to warrant continuing detention.

I depart from the magistrate judge only on two limited issues.  First, in the findings of fact certified in support of the recommendation to hold the Barretts in contempt (since withdrawn), the magistrate judge found that the government had shown that the Barretts had sufficient assets located outside the United States to satisfy, in whole or part, the repatriation order.  The magistrate judge cited Mrs. Barrett's ProduBank balance of $12,792.81 and Mr. Barrett's minority interests in 10 companies.  The contempt was purged but not by application of

the funds that were found by the magistrate judge to be available to purge the contempt. It follows that the funds that were found to be available are either still available or, if not, they are not because the Barretts have done something else with them while the writ has been pending.

I am satisfied by my review of the record of the October 11 and November 21, 2013 hearings that there are sufficient funds available to the Barretts via some combination of the ProduBank funds, Mr. Barrett's minority interests, and, if necessary, supplementation from the "dribs and drabs" discussed above, to reduce their debt to the government by at least an additional $16,000.

Second, with respect to the Barretts' interest in the improved real property as established by the government, I do not agree that the defendants have shown that it is not capable of liquidation. What the record contains is the Barretts', essentially Mrs. Barrett's, assertion that it is the subject of a boundary dispute; that despite their efforts, the boundary dispute has not been resolved; that under the law of Ecuador, property subject to a boundary dispute cannot be sold; and that, although for the same reasons the property should not have been sold to the Barretts, they have not chosen to seek recourse against the seller. The Barretts have not provided any support for their assertion regarding Ecuadorian law. They have not documented the existence of a boundary dispute. They have not provided any credible evidence as to why the boundary dispute has lingered; and they have not provided so much as an explanation as to why they have not sought recourse against the seller. All this, I note, is despite Mr. Barrett's testimony that he really does want to pay the tax debt.

In that regard I also find that the record casts significant doubt on the credibility of the Barretts' testimony. I note the following:

- The Barretts obtained a large tax refund fraudulently. They chastised the government for not proving that they signed the 2007 tax return and attempted to blame it on a maverick accountant. When the government produced a copy of their signatures they suggested (with absolutely no evidence) that the government might have superimposed their signatures.
- In any event, they did not return the improperly obtained refund.
- 100% of the money the government has collected to date has been the result of levies and other collection measures. To date, the Barretts have not voluntarily paid anything. The record belies any notion that this is because they could not afford to pay anything.
- For example, the United States questioned Mr. Barrett about $20,000 he had previously transferred to his son Sean Phillips. Mr. Barrett testified that the $20,000 was a loan. However, after being confronted with an email from his son, Mr. Barrett admitted that he might have asked him to hold the money so that the IRS could not take it. He explained that it was a long time ago, and he was very upset. EH, 144–47.
- Mr. Barrett admitted that he paid personal credit cards out of at least two bank accounts in the U.S., neither of which were in his name. *See* EH, 137–140. One of the accounts is owned by Petra Petroleum, a company in which Mr. Barrett has a 12% ownership interest. *Id.* at 137:24–25, 138:1. Another account is owned by another son, Josh Phillips. *Id.* at 123:9–16, 138:15–25, 139:1–2. Mr. Barrett wired approximately $1500–$3000 per month over a 2-3 year period into Mr. Phillips' account. *Id.* at 140:5–11.

- During the October 11, 2013 hearing, the parties stipulated to a Banco Republica of Uruguay[6] bank account that was opened with a $6000 cash deposit and to which Defendants made two subsequent $8000 wires. EH, 125:10–14. Mr. Barrett testified that the current balance on the account was approximately negative $130. *Id.* at 134:16–23. According to Mr. Barrett, the value of the two wire transfers—$16,000—was drawn out in March 2011 and used "mainly for household expenses and [other] expenses." *Id.* at 135:6–13. There was no testimony concerning the use or whereabouts of the $6000 used to open the account. Defense counsel also stipulated that Defendants attempted to make a wire transfer to this bank account in the amount of $48,720, which failed. This amount was ultimately returned to Defendants via a cashier's check with minor fees subtracted. *Id.* at 125:14–19. Mr. Barrett stated that he and his wife used the $48,720 to pay bills and "settle things up." *Id.* at 136:1–5.
- Defendants made many claims that they own bank accounts with little to negative values. The United States appears to have requested the production of bank statements for these accounts, some of which Defendants failed to produce. *See* EH, 42:12–16, 42:22–25, 43:1, 127:5–11. In one case, defense counsel claimed they were unable to provide the bank statement from Banco Bolivariano because the bank failed to respond to requests. *Id.* at 43:3–4. It is unclear why other bank statements were not produced. Defendants also testified that some of their bank accounts have been closed and assets seized by Latin American governments. *See* EH, 45:13–25, 46:11–21. Like most of their testimony, there was no confirmation of these claims.

---

[6] Presumably this is the same bank account as referenced in the April 9, 2013 Default Judgment [Doc. 52] under the name Banco de la Republica Oriental del Uruguay.

- The Barretts filed financial affidavits in this case with two magistrate judges, and, based on those affidavits, they were found to be eligible for the appointment of counsel at government expense. It turns out, however, that shortly before their appearance in front of the magistrate judges, Mrs. Barrett sold water shares in the Fire Mountain Canal Company for $40,000. EH, at 19:23, 20:3–11. But neither Mr. nor Mrs. Barrett disclosed this in their financial affidavits filed with the court. Mrs. Barrett's financial affidavit states that her sole "income from a business . . . or other sources" in the past 12 months was $430 from Social Security. [ECF No. 70] Mr. Barrett's financial affidavit, while more detailed, likewise did not list this $40,000.[7] [ECF No, 68]

In short, the Court cannot trust the testimony of the Barretts. That being the case, their assertions about the unavailability of their real property in Ecuador as a source of funds to reduce their tax debt is unpersuasive. There might be evidence supporting the Barretts' position, but we have not yet seen it.

## CONCLUSION

As indicated, the United States unquestionably established the first and fourth *Mathewson* factors. With respect to the second of the four factors, irreparable injury, the United States may meet this burden by showing that "the taxpayer's departure will substantially prejudice the collection of taxes." *Mathewson*, 1993 WL 113434 at *2. History tells us that the Barretts are unlikely to pay anything towards their tax debt if they are not compelled to do so, and the record

---

[7] The money went into the trust account of an attorney, Mr. Grattan. The Barretts apparently transferred $3,000 to a bank in Oklahoma, *id.* at 20:17–18; about $800 went to Mr. Grattan for his services, *id.* at 23:24–25; and, finally, $30,000 went to pay legal fees to defense counsel in the present case, *id.* at 24:9–10. In addition, Mr. Grattan paid approximately $6,200 to the IRS to satisfy a levy on the account. *Id.* at 20:18–19.

shows that the government has exhausted its sources outside of the writ. Accordingly, the irreparable injury factor has been established.

With respect to the third *Mathewson* factor, which compares the government's injury to the harm to the Barretts of continuing to limit their right to travel, the record establishes that the Barretts have assets available to pay the debt down by at least an additional $16,000. To at least that extent, the Court concludes that the harm to the United States of losing the opportunity to obtain those funds outweighs the harm to the Barretts. The key to the door is in the Barretts' hands.

The question of whether the government's loss of an opportunity for further payment from the value of the Barretts' real estate holdings in Ecuador outweighs the harm to the Barretts is not as clear. The real estate is the largest remaining asset of the Barretts established by the government's evidence, and once the writ is discharged, the government's ability to see anything from that asset is for all practical purposes gone. The real estate may not be capable of liquidation; and if so, then the Court would agree with the magistrate judge that the harm of continued detention based on the real estate's value outweighs the harm to the government of hanging on in the hope that someday something might be realized from this asset. "[T]he restraint on the freedom to travel is an extreme measure." *Mathewson*, WL 113434 at *2. The writ should be discharged upon a showing by the Barretts that there is little or no money available from this asset. *See Bank of America v. Veluchamy*, 643 F.3d 185, 190 (7th Cir. 2011). However, as the record now stands, this Court concludes that the government's harm outweighs the harm to the Barretts with respect to this asset.

In sum, in order for the writ to be discharged, the Barretts must (1) pay the $16,000, and (2) either sell the property and provide the proceeds to the government or prove, with credible evidence, that they actually cannot sell it.

## ORDER

For the reasons discussed above, the Court declines to discharge the writ of ne exeat republica at this time and does not adopt the recommendation of the magistrate judge.

Dated this 29th day of January, 2014.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge